**Alec FISHER, Individually and On Behalf of All Others Similarly Situated, Plaintiff,**

v.

**MONSTER BEVERAGE CORPORATION, Monster Energy Company, and Does 1–20, Inclusive, Defendants.**

Case No. EDCV 12–02188–VAP (OPX)

United States District Court, C.D. California.

Signed November 12, 2013

Azra Z. Mehdi, The Mehdi Firm, PC, San Francisco, CA, for Plaintiff.

Dan E. Marmalefsky, David F. McDowell, Purvi G. Patel, Morrison and Foer-

ster LLP, Los Angeles, CA, for Defendants

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

**[Motion filed on August 30, 2013]**

VIRGINIA A. PHILLIPS, United States District Judge

Defendants Monster Beverage Corporation and Monster Energy Company's (collectively, "Monster" or "Defendants") Motion to Dismiss or in the Alternative, Motion to Strike, came before the Court for hearing on October 21, 2013. The Court considered all papers filed in support of, and in opposition to, the Motion, and the arguments put forth at the hearing, and for the reasons set forth below, the Court GRANTS the Motion without prejudice.

## I. BACKGROUND

### A. Procedural Background

Plaintiffs Alec Fisher, Matthew Townsend, and Connor Rucks[1] (collectively, "Plaintiffs"), on behalf of themselves, and putatively, others similarly situated, bring this action against Monster, seeking redress for Monster's allegedly "unfair and deceptive business and trade practices on behalf of anyone who purchased for personal consumption any of the Monster-branded energy drinks sold under the Monster Rehab® brand name and the original Monster Energy®." (Second Amended Complaint ("SAC") ¶ 1 (Doc. No. 51.))

Plaintiffs allege six claims: (1) violations of California's Unfair Competition Law, Cal. Bus. & Prof.Code § 17200, *et seq.* ("UCL Claim"); (2) violations of California's False Advertising Law, Cal. Bus. & Prof.Code § 17500, *et seq.* ("FAL Claim"); (3) violations of California's Consumer Legal Remedies Act, Cal. Civ.Code § 1750, *et seq.* ("CLRA Claim"); (4) breach of express and implied warranty ("Breach of Warranty Claim"); (5) violations of the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* ("MMWA Claim"); and (6) unjust enrichment ("Unjust Enrichment Claim").

Plaintiffs filed their First Amended Complaint on March 7, 2013. (Doc. No. 20.) Defendants filed a Motion to Dismiss, and on July 9, 2013, the Court granted Defendants' Motion to Dismiss the First Amended Complaint with limited leave to amend. (July 9, 2013 Minute Order Granting Defendants' Motion to Dismiss ("MTD I Order") (Doc. No. 48.)) The Court dismissed the Complaint on several grounds, including: (1) Plaintiffs Fisher and Rucks did not allege Article III standing sufficiently; (2) the allegations failed to meet Federal Rule of Civil Procedure Rule 9(b)'s specificity requirement; (3) Plaintiffs' consumer protection claims (UCL, FAL, and CLRA) based on Monster's failure to label and warn adequately were preempted; (4) failure to state a claim under the UCL, FAL, and CLRA; (5) failure to allege any representations constituting an express warranty; (6) allegations supporting the breach of implied warranty were preempted; and (7) failure to allege a quasi-contractual theory in support of their unjust enrichment claim.

The Court granted Plaintiffs limited leave to amend, instructing that Plaintiffs "may not pursue consumer protection claims that are preempted, i.e., that seek to impose requirements 'not identical' to the FDCA or those required by the FDA. Plaintiff is also instructed to comply with FRCP 8 ('a short and plain statement of the claim') and FRCP 9(b) ('fraudulent

---

1. Connor Rucks is no longer a Plaintiff in this Action.

conduct must be alleged with particularity.')." (MTD I Order at 25.)

Plaintiffs filed their Second Amended Complaint on July 26, 2013. Defendants filed their Motion to Dismiss, or in the Alternative, Motion to Strike, along with Appendices A and B on August 30, 2013. Defendants also filed a Request for Judicial Notice in Support of their Motion to Dismiss Second Amended Complaint ("RJN"), the Declaration of Purvi G. Patel, and Exhibits 1–8. (Doc. Nos. 59, 60–60-8.) On September 25, 2013, Plaintiffs filed their Opposition to Defendants' Motion to Dismiss the Second Amended Complaint ("Opp'n.") (Doc. No. 63) and Opposition to Defendants' Request for Judicial Notice ("Opp'n. to RJN.") (Doc. No. 64.). On October 7, 2013, Defendants submitted their Reply in Support of Defendants' Motion to Dismiss Second Amended Complaint ("Reply") (Doc. No. 65.) Defendants also filed (1) a Reply in support of its RJN ("RJN Reply") (Doc. No. 66); (2) a supplemental request for judicial notice (Doc. No. 67); (3) the Declaration of Eva Lilja in support of the supplemental request (Doc. No. 68); (4) the Declaration of Purvi Patel in support of the Motion to Dismiss (Doc. No. 69).

**B. Request for Judicial Notice**

 Monster filed a RJN requesting the Court to take judicial notice of eight exhibits, and a Supplemental RJN asking the Court to take judicial notice of two additional exhibits. The Court finds it appropriate to take judicial notice of exhibits (1) a public letter from the Food and Drug Administration ("FDA") to Congress regarding the FDA's investigation into energy drinks (Doc. No. 59–1); (2) a public notice from the FDA announcing the FDA's investigation regarding the safety of caffeine in food products, available on the FDA's website (Doc. No. 59–2); (3) a letter from Monster to Margaret A. Hamburg, FDA Commissioner of Food and Drugs, in response to FDA's request for further substantiation (Doc. No. 59–3); (4) a letter from the American Beverage Association to Margaret A. Hamburg, FDA Commissioner of Food and Drugs, in response to the FDA's investigation regarding the safety of caffeine as an ingredient in energy drinks (Doc. No. 59–4); (5) a public notice from the Institute of Medicine of the National Academies ("IOM") announcing its two-day public workshop to discuss potential health impacts stemming from the consumption of caffeine, available on IOM's website (Doc. No. 59–5); and (6) an excerpt from the "Agenda Book" for the Institute of Medicine (IOM) Workshop on Potential Health Hazards Associate with Consumption of Caffeine in Food and Dietary Supplements (Doc No. 59–6).

Exhibits 1–4 are judicially noticeable because the information "was made publicly available by government entities [ ], and neither party disputes the authenticity of the websites or the accuracy of the information displayed therein." *Daniels–Hall v. Nat'l Educ. Ass'n,* 629 F.3d 992, 998–99 (9th Cir.2010) (courts may take judicial notice of information posted on an official government website). The Court has taken judicial notice of the existence of these documents, and does not accept as true the facts or contents of the documents. (*See* Opp'n. to RJN at 6.)

Exhibits 5 and 6 are judicially noticeable because they are "not subject to reasonable dispute [and] can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

The Court GRANTS Monster's RJN with respect to exhibits 1–6. The Court finds no need to rely on the additional exhibits (7–10) in the disposition of this

Motion, and DENIES Monster's RJN for these exhibits.

## C. Relevant Factual Allegations

### 1. Common Factual Allegations

In their Opposition, Plaintiffs divide their claims against Monster into "on-label" and "off-label" claims. (Opp'n. at 1.) "On-label" claims are specific misrepresentations on the labels and packaging of the Monster Drinks.[2] (*Id.* at 1.) The "off-label" claims concern Monster's false and deceptive marketing campaign targeting children. (*Id.* at 2.)

Plaintiffs allege three specific misrepresentations on the labels of the Original Monster and Rehab Varieties cans. Plaintiffs allege the Rehab Varieties contained the following two misrepresentations: (1) "quenches thirst, hydrates like a sports drink, and brings you back after a hard day's night"[3] ("Hydrates Like A Sports Drink Statement") (*Id.* at 5); (2) "RE-FRESH, RE-HYDRATE, REVIVE" or "RE-FRESH, RE-HYDRATE, RE-STORE" ("Re-Hydrate Statement"). (*Id.*) Plaintiffs allege these statements are misrepresentations because, in fact, Rehab Varieties do not hydrate like a sports drink, and actually could cause dehydration. (SAC ¶ 6.) The elevated levels of caffeine in energy drinks can act as a diuretic and lead to dehydration. (SAC ¶¶ 36–37.) To the extent the Monster

Drinks do hydrate, they do not hydrate like a sports drink. (SAC ¶ 36.)

Plaintiffs allege the labeling for Monster Original drinks contains the following misrepresentation: "It's the ideal combo of the right ingredients in the right proportion to deliver the big bad buzz that only Monster can" ("Ideal Combo Statement") (*Id.* ¶ 7.) Plaintiffs allege this statement is false and misleading because "it is not the ideal combo of the right ingredients in the right proportion" and the statement omits "material facts regarding the potential health risks associated with the frequent consumption of Monster Drinks." (*Id.* ¶¶ 7, 41.)

Plaintiffs also allege "off-label" claims related to Monster's advertising strategy. (Opp'n. at 1–2.) Plaintiffs allege that Monster specifically targets youth between the ages of 9 to 24 despite the high caffeine levels in Monster Drinks and the evidence of serious health risks these levels may pose. (SAC ¶ 12.) In addition, Monster fails to include specific warnings for teenagers and youth. (*Id.* ¶ 46.) Plaintiffs argue that targeting young people without including any warnings directed at them is deceptive. (*Id.* ¶ 50.)

Plaintiffs allege that Monster targets adolescents and youth through a variety of strategies including, free samples and other promotions at high schools (SAC ¶ 9), references to sex and alcohol (*id.* ¶¶ 51–54), prize promotions (*id.* ¶ 55), pages on

---

**2.** It is unclear from the SAC and the Opposition whether Plaintiffs allege that "Consume responsibly—Max 1 can per four hours, with limit 3 cans per day. Not recommended for children, people sensitive to caffeine, pregnant women or women who are nursing" ("Consume Responsibly Statement") is an "on-label" misrepresentation. Although it appears the SAC alleges the Consume Responsibly Statement is a misrepresentation (*see* SAC ¶¶ 24–25, 42–45), the statement is not listed in the Opposition as one of the "three

on-label misrepresentations." (Opp'n. at 5–6.) Relying on Plaintiffs' arguments and interpretation of their SAC, the Court has not considered the *Consume Responsibly State-ment* an alleged misrepresentation for the purposes of this Motion.

**3.** In March 2013 *Defendants changed the lan-guage on the label to:* "quenches thirst, fires you up, and is the perfect choice after a hard day's night." (SAC ¶ 5)

the social networking site, Facebook (*id.* ¶ 56), and sponsoring extreme sports events and concerts (*id.* ¶ 48). Monster has sought endorsements from music celebrities and popular sports figures. (*Id.* ¶ 57.) Few of these celebrities, however, actually consume Monster Drinks. (*Id.*) Rather, Monster invented "Monster Tour Water" for celebrities to consume, which is water packaged in the same cans as Monster Drinks. (*Id.* ¶¶ 58–60.)

Monster's misrepresentations and deceptive advertising campaign has caused serious bodily injury to consumers and continues to pose a danger. (*Id.* ¶¶ 62, 66.) Consumption of Monster Drinks "can raise one's heart rate" and increase blood pressure. (*Id.* ¶ 65.) Consumption of energy drinks may also result in "heart palpitations." (*Id.*)

Plaintiffs allege Monster has profited immensely and has been unjustly enriched from its "false and misleading" marketing, advertising, and labeling. (*Id.* ¶ 15.)

## 2. Allegations Specific to Individual Plaintiffs

### i. Plaintiff Alec Fisher

Plaintiff Fisher ("Fisher") first consumed a Monster Drink in or around 2007 at the age of sixteen. (*Id.* ¶ 23.) Monster sent trucks to park outside Fisher's high school and hand out free Monster Drinks. (*Id.*) The Monster employees did not ask people their ages before dispensing the free cans of Monster Drinks. (*Id.*) Fisher believed that the Monster Drinks were safe for consumption and saw nothing on the label of the Monster Drink can to believe otherwise. (*Id.*) Fisher most frequently consumed the Original Monster and Monster Energy Assault.[4] If Fisher had known of the health risks of Monster Drinks he would not have consumed or purchased the drinks. (*Id.*)

### ii. Plaintiff Matthew Townsend

Plaintiff Townsend ("Townsend") has been purchasing and consuming a variety of Monster Drinks for the past six years, since he was 37 years old. (*Id.* ¶ 24.) Townsend first tried an Original Monster drink in June 2007, which he purchased from a vitamin store. (*Id.*) Townsend read the label on an Original Monster drink and decided to buy it because the label indicated that the drink had 100 percent of daily values of vitamins B2, B3, B6, B12 and supplements. (*Id.*) A few days later, Townsend bought and consumed a Monster Drink instead of coffee because he believed it was better than coffee because of the vitamins. Over the past six years, Townsend has "tried every variety ever created," including Monster Original and the Rehab Varieties, and frequently purchased multi-packs of Monster Drinks. (*Id.* ¶ 24(a).)

■ Plaintiff Townsend read the Monster Drink label and made sure never to drink more than three cans a day as prescribed on the label. (*Id.*) Townsend also read and relied on the Rehab Varieties product label Hydrates Like a Sports Drink Statement.[5] (*Id.*) Townsend be-

---

**4.** Monster Energy Assault is not a variety of Monster Beverages included in this action.

**5.** Monster contends the Court should disregard this allegation because it is "inconsistent" with FAC ¶ 32, where Townsend alleged he was "amused by Monster's comments on the back of the can, which he thought were very clever." (Mot. at 8.) An "amended complaint may only allege other facts consis-

tent with the challenged pleading." *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 297 (9th Cir.1990) (citations omitted.) Townsend's statement that he relied on the Hydrates Like a Sports Drink Statement on Rehab Varieties is not necessarily inconsistent or contradictory to his statement he was generally amused by Monster's comments on the back of the cans. Monster has a variety of different prod-

lieved Monster Drinks were safe for consumption, and he did not see anything in the product labels to contradict this. (*Id.*)

Plaintiff Townsend's addiction to Monster Drinks resulted in serious health issues, beginning in the summer of 2012. (*Id.* ¶ 24(b).) Townsend's heart frequently pounded too fast, and he had chest pains and trouble sleeping. (*Id.*) He attempted to stop drinking Monster Drinks, but without the drinks, he experienced severe headaches. (*Id.*)

In September 2012, Townsend became faint and feverish, and had a heightened heart rate. (*Id.*) Townsend went to the emergency room at a local hospital. (*Id.*) His blood pressure was registered at an average of 225 over 139, which is "critically high". (*Id.*)

### iii. Plaintiff Ted Cross

Plaintiff Cross ("Cross") began purchasing and consuming Monster Drinks in or around 2008. (*Id.* ¶ 25.) For approximately two years, he consumed one can of Original Monster per day. (*Id.*) After approximately two years Cross increased his consumption to two cans per day, a few days per week. (*Id.*) He frequently purchased Monster Energy Absolutely Zero and Java Monster Mean Bean.[6] (*Id.*)

At a 2011 dental appointment on a morning when Plaintiff Cross had consumed two Monster Drinks, Cross's blood pressure registered at 260 mm Hg systolic. (*Id.*) In October 2012, Cross experienced vision problems, dizziness, nausea, and a severe headache after drinking two Monster Energy Absolutely Zero drinks. (*Id.*) He was transported by ambulance to a hospital and operated on for a bleeding blood vessel in his brain. (*Id.*) At the time

he was admitted to the hospital his blood pressure was 280 mm Hg systolic. (*Id.*)

Plaintiff Cross relied on the Consume Responsibly Statement that Monster Drinks were safe to consume if limited to three cans per day. (*Id.* ¶ 25(a).) He also relied on the Ideal Combo Statement on the Original Monster label. (*Id.*) Cross understood this to mean that "Monster Drinks were safe (or not unsafe) for consumption and would provide energy without exposing people to health risks." (*Id.*) If he had known the "true facts," Plaintiff Cross would not have purchased and consumed Monster Drinks.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed.R.Civ.P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (holding that the Federal Rules require that a plaintiff provide " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." (quoting Fed.R.Civ.P. 8(a)(2))); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party. *See Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir.

---

ucts, with different labels that contain multiple "comments". Furthermore, it is conceivable a person could both rely on and be amused by a single comment.

**6.** These two varieties of Monster Beverages are not included in Plaintiffs' claims.

2005); *ARC Ecology v. U.S. Dep't of Air Force*, 411 F.3d 1092, 1096 (9th Cir.2005); *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir.1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.*

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955; *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). Recently, the Ninth Circuit clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual alle-

gations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir.2011).

Although the scope of review is limited to the contents of the complaint, the Court may also consider exhibits submitted with the complaint, *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990), and "take judicial notice of matters of public record outside the pleadings." *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir.1988).

## III. DISCUSSION

Monster has moved to dismiss, pursuant to Federal Rules of Civil Procedure 8, 9(b), 12(b)(1), and 12(b)(6), on the following grounds: (1) Plaintiffs lack standing; (2) Plaintiffs fail to satisfy basic pleading standards and the heightened pleading standard for the purported deliberately deceptive conduct they allege; (3) Plaintiffs fail to state a claim for relief; (4) Plaintiffs' claims are preempted or subject to the FDA's primary jurisdiction; and (5) Plaintiffs' SAC is not a "short and plain statement" of facts showing Plaintiffs are entitled to relief.

## A. Standing [7]

Monster argues that Plaintiffs Fisher, Townsend, and Cross do not satis-

---

7. In the SAC, Plaintiffs narrowed the definition of "Monster Drinks"; the FAC included 28 different beverages, but the SAC only included the original Monster Energy product and the products under the Monster Rehab brand name. In the Opposition, Plaintiffs argue that they continue to represent mislabeling claims concerning all varieties of Monster-brand energy drinks. (Opp'n. at 12 n. 11.) Plaintiffs mention this argument in a footnote, and have not sufficiently alleged facts showing that all Monster-branded energy drinks are sufficiently similar to support standing for all Monster-branded energy drinks. *See Astiana v. Dreyer's Grand Ice Cream, Inc.*, 2012 WL 2990766, *1, 11 (N.D.Cal. July 20, 2012) ("the critical inquiry seems to be whether there is sufficient similarity between the products purchased and not purchased."); *Colucci v. ZonePerfect Nutrition Co.*, 2012 WL 6737800, *1, 4 (N.D.Cal. Dec. 28, 2012).

fy Article III standing requirements. (Mot. at 10.) If a plaintiff lacks standing under Article III of the U.S. Constitution, then the Court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). Defendants make a facial attack on Plaintiffs' standing, and when evaluating a facial attack, the Court "must accept as true all material allegations in the complaint, and must construe the complaint in" Plaintiffs' favor. *Chandler v. State Farm Mut. Auto. Ins. Co.,* 598 F.3d 1115, 1121–22 (9th Cir. 2010).

 Article III of the Constitution gives federal courts jurisdiction over "cases and controversies." U.S. Const. Art. III § 2, cl. 2. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Standing, therefore, is a threshold issue in every federal case. *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004); *Warth,* 422 U.S. at 517–18, 95 S.Ct. 2197. Claims brought under California's UCL, FAL, or CLRA must satisfy federal standing requirements under Article III as well. *See Cantrell v. City of Long Beach,* 241 F.3d 674, 683 (9th Cir.2001) (parties asserting state claims in federal court must meet Article III standing requirements).

 A plaintiff must satisfy "the irreducible constitutional minimum of standing" by demonstrating: (1) he has suffered an " 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) there is a causal connection between the injury and the conduct complained of—that is, the injury is "fairly traceable" to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it is "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable judicial decision. *Lujan v. Nat'l Wildlife Fed'n,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "At the pleading stage, general factual allegations of injury resulting from defendant's conduct may suffice. . . ." *Id.*

 For the purposes of Article III standing an injury may be physical or economic. *See Sierra Club v. Morton,* 405 U.S. 727, 733–34, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) ("[P]alpable economic injuries have long been recognized as sufficient to lay the basis for standing.") In order to assert the type of economic injury that Plaintiffs are alleging, they must demonstrate they were allegedly deceived, and either purchased a product they would not have otherwise purchased, paid a premium or overpayed for the product, or would have purchased an alternative product. *See Pirozzi v. Apple Inc.,* 913 F.Supp.2d 840, 847 (N.D.Cal.2012) ("Overpaying for goods or purchasing goods a person otherwise would not have purchased based upon alleged misrepresentations by the manufacturer would satisfy the injury-in-fact and causation requirements for Article III standing"); *Lanovaz v. Twinings N. Am., Inc.,* 2013 WL 675929, *1, 6 (N.D.Cal. Feb. 25, 2013) ("The alleged purchase of a product that plaintiff would not otherwise have purchased but for the alleged unlawful label is sufficient to establish an economic injury-in-fact for plaintiff's unfair competition claims."); *Boysen v. Walgreen Co.,* 2012 WL 2953069, *1, 7 (N.D.Cal. July 19, 2012) (an economic injury is sufficiently alleged if plaintiff would have purchased an alternative beverage "had defendant's [beverage] been differently labeled."); *Chavez v. Blue Sky Natural Beverage Co.,* 340 Fed.Appx. 359, 360–61 (9th Cir.2009) (unpublished) (Article III standing where

Plaintiff "purchased beverages that he otherwise would not have purchased in absence of the alleged misrepresentations.").

■■■ Although Article III standing may be satisfied with either a physical or an economic injury, standing under the UCL, FAL, and CLRA requires an economic injury. *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F.Supp.2d 942, 965 (S.D.Cal.2012). To have standing under the UCL and FAL, a Plaintiff must allege he "has suffered injury in fact and has lost money or property as a result of the unfair competition." *See* Cal. Bus. & Prof.Code §§ 17204, 17203; *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 320, 120 Cal.Rptr.3d 741, 246 P.3d 877 (2011). Similarly, the CLRA requires Plaintiffs to allege a "tangible increased cost or burden to the consumer." *Meyer v. Sprint Spectrum L.P.*, 45 Cal.4th 634, 88 Cal.Rptr.3d 859, 200 P.3d 295 (2009). Accordingly, the Court evaluates standing both under Article III and the UCL, FAL, and CLRA statutory requirements.

### 1. Plaintiff Fisher

In the MTD I Order, the Court dismissed all claims brought by Fisher because he failed to plead an "injury in fact" for the purposes of Article III standing. (MTD I Order at 10.) In the SAC, Plaintiff Fisher again fails to allege an injury.

■■■ Fisher alleges he suffered an economic injury because he relied on specific misrepresentations in purchasing Monster Drinks. (Opp'n. at 16.) As in the FAC, the SAC does not allege Plaintiff Fisher relied on any specific misrepresentations by Monster, and only states that Fisher "had no reason to believe" that Monster Drinks were "not safe or posed a health risk", and that if he had known of the health risks he would not have continued to purchase Monster Drinks. (SAC ¶ 23.) As before, Fisher is not alleging Monster made any misrepresentations or deceived him; rather, he alleges only that Monster failed to label their products in a way that would lead Plaintiffs to "believe" that the Monster Drinks "could" be injurious to their health.[8] The Court finds Plaintiff Fisher has not alleged Article III standing sufficiently, and accordingly the claims brought by Plaintiff Fisher are DISMISSED.

### 2. Plaintiff Townsend

■■■ Plaintiff Townsend has alleged sufficient facts to support standing. Townsend frequently purchased "Monster Drinks", which as defined in the SAC, includes Original Monster and the Rehab Varieties.[9] (SAC ¶ 8.) Townsend alleges he read and relied on the "Monster Drinks" Consume Responsibly Statement and the Rehab Varieties' Hydrates Like a

---

8. Plaintiffs acknowledge this deficiency, and argue that "to the extent Plaintiff Fisher did not rely upon a specific misrepresentation, he also has standing by virtue of being a Member of Monster's target group—young adolescent males—when he began purchasing and consuming Monster Drinks." (Opp'n. at 17 n. 15.) Plaintiff's membership in the target group does not constitute a "concrete" or "actual" injury as required by Article III. *See Johns v. Bayer Corp.*, 2010 WL 476688, *1, 5 (S.D.Cal. Feb. 9, 2010) ("Plaintiff does not allege exposure to a long-term advertising campaign ... He cannot expand the scope of his claims to include a product he did not

purchase or advertisements relating to a product that he did not rely upon".).

9. Defendants argue that the SAC does not specifically allege that Townsend purchased any of the products from the Monster Rehab variety. Although Plaintiffs' use of "Monster Drinks" is confusing and at times inconsistent, the Court must make all inferences in favor of the Plaintiffs. When the Plaintiffs' definition of "Monster Drinks" is applied, the SAC sufficiently alleges Townsend purchased all of the five Rehab drink varieties. This is consistent with other statements in the SAC that Townsend has consumed "every variety

Sports Drink Statement. (*Id.*) "Purchasing goods a person otherwise would not have purchased based upon alleged misrepresentations by the manufacturer" satisfies the injury in fact and causation standing requirements. *Pirozzi*, 913 F.Supp.2d at 847. Townsend alleges that he relied on these representations in purchasing Monster Drinks, and would not otherwise have bought the drinks. (SAC ¶ 24.) Townsend has adequately pled an economic injury.

In addition, Townsend alleges that as a result of his consumption of Monster Drinks, he suffered physical injuries, including his heart frequently pounding too fast, chest pains, trouble sleeping, high blood pressure, and a visit to the emergency room. (SAC ¶ 24(a).) This injury is also sufficient to meet the Article III injury, causation, and redressability requirements. Accordingly, Plaintiff Townsend has adequately alleged Article III standing and UCL, FAL, and CLRA statutory standing.

### 3. Plaintiff Cross

 Plaintiff Cross has alleged sufficient facts to support standing for claims related to the Original Monster drink label. Cross frequently purchased multi-packs of Original Monster.[10] (*Id.* ¶ 25.) Cross alleges he read and relied on the Consume Responsibly and Ideal Combo Statements on the Original Monster label. (*Id.* ¶ 25(a).) Cross understood the Ideal Combo Statement to mean that "Monster Drinks were safe (or not unsafe) for consumption and would provide energy without exposing people to health risks" and he would not have purchased Original Monster otherwise. (*Id.*) In other words Plaintiff Cross has alleged he would not have purchased the product but for the alleged misrepresentation.[11] (*Id.* ¶ 25.) Accordingly, Plaintiff Cross has adequately alleged an economic injury in fact in relation to the claims involving the Original Monster sufficient for Article III standing and UCL, FAL, CLRA statutory standing.

### B. Fed.R.Civ.P. 9(b) Particularity Requirements and Fed.R.Civ.P. 8 Plausibility Requirements

 Monster argues Plaintiffs fail to meet Rule 9(b)'s particularity require-

---

of energy drink created by Monster, including every Monster Rehab product and Monster Energy." (SAC ¶ 24(a).)

10. Defendants argue Plaintiff Cross does not have standing for claims related to the Rehab Varieties because the SAC does not allege he ever purchased the Rehab varieties. (Mot. at 10.) Here, the Court agrees with Defendants. The SAC uses the term "Monster Drinks" to describe drinks purchased by Plaintiff Cross, but also states specifically that Cross drank a can of the "original Monster Energy" per day, and that Cross "bought and consumed Monster Energy Absolutely Zero and Java Monster Mean Bean." (SAC ¶ 9.) Here, it would not be fair to read the term "Monster Drinks" to include the Rehab variety, as defined in the SAC, since that reading is explicitly contradicted by other statements in the SAC. In paragraph 25, it seems that "Monster Drinks"

only refers to the types of Monster beverages Plaintiff Cross consumed, which does not include the Rehab Varieties.

11. Plaintiff Cross also alleges he suffered high blood pressure, a physical injury, after consuming two "Monster Drinks." It is unclear, however, whether the "Monster Drinks" consumed were among the varieties involved in the instant action because Plaintiffs' use of the term "Monster Drinks" is confusing and inconsistent in SAC paragraph 25. Plaintiff Cross also alleges that after drinking two Monster Energy Absolutely Zero drinks, he was hospitalized and underwent surgery for a bleeding blood vessel in his brain. (SAC ¶ 10.) Since Monster Energy Absolutely Zero is a variety of drink not included in this action, Plaintiff Cross does not have standing based on this injury.

ment. The heightened pleading standard of Rule 9(b) applies to state law claims sounding in fraud that are brought in a federal action. *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1102–03 (9th Cir. 2003). The fraudulent conduct must be alleged with particularity under Rule 9(b). *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1125 (9th Cir.2009). To meet the particularity requirement, Plaintiffs must allege adequately, "the who, what, when, where and how" of the purportedly misleading statements. *Vess,* 317 F.3d at 1106. "[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.),* 42 F.3d 1541, 1548 (9th Cir.1994).

## 1. Plaintiff Fisher

 Plaintiff Fisher does not allege he was exposed to or relied on any specific misrepresentations by Monster. Fisher alleges he was exposed to Monster's marketing strategy, part of Plaintiffs' "off-label" claims, when he received a free Monster Drink at his high school when he was sixteen, and that Monster employees were not asking people their ages before dispensing Monster Drinks. (SAC ¶ 23.) Fisher does not allege what was false or misleading about this transaction, except to state that he "had no reason to believe that Monster Drinks were not safe or posed health risks." (*Id.*) This is not sufficient to support a fraud claim. Accordingly, all claims by Plaintiff Fisher are DISMISSED for lack of particularity under Rule 9(b).

## 2. Plaintiff Townsend
### i. Original Monster

Plaintiff Townsend alleges purchasing an Original Monster drink in early June 2007 in a vitamin store, and subsequently purchasing multi-packs of "Monster Drinks", which as defined by Plaintiffs includes Original Monster and Rehab Varieties, "frequently" (SAC ¶ 25(a).) In the SAC, Townsend seems to allege he read and relied on the Consume Responsibly Statement on the Original Monster and Rehab Varieties (*Id.*) In their Opposition, however, Plaintiffs explicitly limit the "on-label" misrepresentations at issue to three statements, which do not include the Consume Responsibly Statement. (Opp'n. at 5, 13.) Following Plaintiffs' interpretation of their Complaint, the Court finds Plaintiff Townsend has not alleged a specific misrepresentation in relation to Original Monster, and therefore fails to meet the Rule 9(b) particularity requirements in relation to the Original Monster drink.

### ii. Rehab Varieties

 Plaintiff Townsend fails to plead with particularity his claims concerning Rehab Varieties. The SAC does not allege when, during a six-year period of time, Townsend actually purchased a Rehab Variety drink, read the Hydrates Like a Sports Drink Statement, and relied on the statement in making the purchase. The SAC merely alleges that since 2007 he "frequently" purchased multi-packs of "Monster Drinks", and that "Monster Drinks" is defined to include all the Rehab Varieties. (SAC ¶ 24(a).) Townsend also does not allege what was false or misleading about the Hydrates Like a Sports Drink Statement. (SAC ¶ 25.)

Plaintiffs argue that other Courts have found that alleging the product was purchased in a specific state during a specific time period is sufficient to answer the questions of "when and where" and put Defendants on notice of the allegations. *See Jones v. ConAgra Foods, Inc.,* 912 F.Supp.2d 889, 902 (N.D.Cal.2012) ("Plaintiffs' allegations that they bought the prod-

ucts in California since April 2008 are sufficient to put Defendant on notice of the claims against it."); *Peviani v. Natural Balance, Inc.*, 774 F.Supp.2d 1066, 1071 (S.D.Cal.2011) (Particularity requirement satisfied where Plaintiff pleaded the year and vendor where product was purchased).

Another Court in this District found that a similar pleading was not sufficient to meet the particularity requirements under FRCP 9. *See Yumul v. Smart Balance, Inc.*, 733 F.Supp.2d 1117, 1124 (C.D.Cal. 2010) (Claim dismissed when Plaintiff alleged purchasing the product "repeatedly" throughout the class period but gave no additional specifics and did not specify which retailers the product was purchased from); *see also Edmunson v. Procter & Gamble Co.*, 2011 WL 1897625 (S.D.Cal. May 17, 2011) (Plaintiff did not allege when during the class period, where, how many, or how many times he purchased the product at issue or was exposed to the alleged misrepresentations).

Assuming that Townsend's allegations that he purchased the product within California since June 2007 is sufficient to meet the "when and where" requirements and put Defendants on notice as to the claims, Plaintiff Townsend still does not satisfy the Rule 9b particularity requirements. Townsend has not alleged with enough particularity when the Rehab Variety drinks were purchased because in March 2013 Defendants changed the label on Monster Rehab varieties to remove the Hydrates Like a Sports Drink Statement that Plaintiff relied on. *See Jones*, 912 F.Supp.2d at 903 (since Defendants recently changed the label, it is "necessary to know more specifically when Plaintiffs purchased" the products). It should also be

noted that the period of time alleged in the SAC is longer than the class period, which is December 12, 2008 to the present, so it is possible that while Plaintiff Townsend may have purchased Rehab Varieties between 2007 to 2008, he did not actually purchase a Rehab Variety drink during the class period. Plaintiff Townsend's claims related to the Rehab Varieties as DISMISSED for failure to comply with Rule 9(b).

### 3. Plaintiff Cross

Plaintiff Cross fails to plead with particularity his claims related to Original Monster and the Rehab Varieties. Cross does not allege relying on any misrepresentations in relation to the purchase of the Rehab Varieties, and accordingly has failed to plead with sufficient particularity any claims related to the Rehab Varieties.[12]

With respect to the Original Monster drink, Plaintiff Cross alleges that the misrepresentation he relied on was the Ideal Combo Statement. Plaintiff Cross believed this statement meant the drinks "would safely provide energy without exposing him to health risks." (SAC ¶ 25(a).) Assuming Plaintiff Cross meets the Rule 9(b) particularity requirements, this claim would be dismissed under the plausibility standards of Rule 8. In order for a statement to be a misrepresentation under CLRA, FAL, and UCL, it must be likely to deceive a reasonable consumer. *See Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir.2008); *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir.1995). Here, it is not plausible that a reasonable consumer would understand the Ideal Combo Statement to constitute a represen-

---

**12.** As with Plaintiff Townsend, the SAC again appears to allege that Plaintiff Cross relied on the Consume Responsibly Statement on both the original Monster Energy and the Monster Rehab varieties (*see* SAC ¶ 25(a)), but in light of Plaintiffs' arguments in their Opposition, the Court has not analyzed this statement as a misrepresentation.

tation of safety. Accordingly, Plaintiff Cross's claims are DISMISSED for failure to comply with Rule 8.

### 4. "Off-label" Claims

Plaintiffs' "off-label" claims in relation to Monster's marketing and advertising strategy are not plead with particularity. Plaintiffs, relying on *In re Tobacco II Cases*, 46 Cal.4th 298, 306, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009), argue they may base their UCL, FAL, and CLRA claims on Monsters' prolonged marketing and advertising campaign even if the Plaintiffs do not identify specific advertisements or statements. (Opp'n. at 14.) The decision in *In re Tobacco* was "predicated on Plaintiff's exposure to an 'extensive and long-term advertising campaign.'" *Bronson v. Johnson & Johnson, Inc.*, 2013 WL 1629191, *1, 3 (N.D.Cal. Apr. 16, 2013). In the SAC Plaintiffs have not alleged a similarly extensive and lengthy advertising campaign, and even if they had, the existence of a prolonged marketing and advertising strategy does not relieve Plaintiffs of the need to allege exposure to the marketing strategy and particular misrepresentations relied upon. *See id.*; *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009) (failed to allege particular circumstances surrounding allegedly fraudulent marketing materials); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F.Supp.2d 880, 926 (C.D.Cal.2012); *In re Ferrero Litig.*, 794 F.Supp.2d 1107, 1112 (S.D.Cal.2011) (failed to allege exposure to marketing materials); *see also Comm. On Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal.3d 197, 219, 197 Cal.Rptr. 783, 673 P.2d 660 (1983) ("Plaintiffs should

be able to base their cause of action upon an allegation that they acted in response to an advertising campaign even if they cannot recall the specific advertisements.").

In regard to actual exposure to Defendants' marketing strategy, the SAC merely alleges that Plaintiff Fisher received a free "Monster Drink" from a truck parked outside his high school, but as stated earlier, does not allege what was false or misleading about this transaction, as required under Rule 9(b).

Although the Court finds that Plaintiffs' SAC is subject to dismissal on a number of other grounds, as set forth below, the Court finds the SAC should be DISMISSED on the additional ground that the allegations fail to meet Rule 9(b)'s specificity requirement.

### C. Failure to State a Claim

Monster argues Plaintiffs' UCL, FAL, CLRA and breach of express and implied warranty claims fail as a matter of law because Plaintiffs have not alleged reliance or a duty to disclose and Plaintiffs' affirmative misrepresentations claims involve non-actionable "puffery." [13] (Mot. at 19.)

### 1. UCL, FAL, and CLRA Claims

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising...." Cal. Bus & Prof.Code § 17200. "An act can be alleged to violate any or all of the three prongs of the UCL—unlawful, unfair, or fraudulent." *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal.App.4th 1544, 1554, 62 Cal.Rptr.3d 177 (2007). "To support a

---

**13.** Monster also argues Plaintiffs' UCL, FAL, and CLRA claims fail as a matter of law because Monster's compliance with FDCA regulations provides a "safe harbor" under *Cel–Tech Commc'ns Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 182, 83 Cal. Rptr.2d 548, 973 P.2d 527 (1999) for the conduct at issue. (Mot. at 19.) As the Court finds Plaintiffs' claims are dismissed on multiple other grounds, it is not necessary to address Monster's *Cel–Tech* safe harbor argument.

claim for a violation of the UCL, a plaintiff cannot simply rely on general common law principles." *Textron Fin. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 118 Cal.App.4th 1061, 1072, 13 Cal.Rptr.3d 586 (2004).

The FAL prohibits the dissemination of false or misleading statements in connection with advertising. Cal. Bus. & Prof. Code § 17500. "Section 17500 has been broadly construed to proscribe 'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App.4th 663, 679, 38 Cal.Rptr.3d 36 (2006).

█ The CLRA makes illegal various "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ.Code § 1770(a). Conduct that is "likely to mislead a reasonable consumer" violates the CLRA. *Colgan*, 135 Cal. App.4th at 680, 38 Cal.Rptr.3d 36.

█ Claims under the UCL, FAL, and CLRA are governed by the reasonable consumer test. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir.2008) (citations omitted). Under this test, the plaintiff must show that members of the public are likely to be deceived. *Id.* However, for a statement to be actionable, there is no requirement that the statement be false— these laws also prohibit "advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Id.* (citation and alteration omitted). Under California law, "whether a business practice is deceptive will usually be a question of fact not appropriate for decision" on a motion to dismiss, and it is a "rare situation" where granting a motion to dismiss a false advertising claim is appropriate. *Id.* (citations omitted)

█ Plaintiffs' claims sound in fraud. When claims under the UCL, FAL, or CLRA sound in fraud, "plaintiffs are required to prove actual reliance on the allegedly deceptive or misleading statements, and that the misrepresentation was an immediate cause of the injury-producing conduct." *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 793–94 (9th Cir.2012); *Low v. LinkedIn Corp.*, 900 F.Supp.2d 1010, 1026 (N.D.Cal.2012). "For fraud-based claims under all three consumer statutes the named Class members must allege actual reliance to have standing." *In re Sony Gaming Networks and Customer Data Security Breach Lit.*, 903 F.Supp.2d 942, 969 (S.D.Cal.2012).

Plaintiffs allege three specific "on-label" misrepresentations: (1) Hydrates Like A Sports Drink Statement, (2) Re-hydrate Statement, and (3) Ideal Combo Statement. The Court previously held that the Hydrates Like a Sports Drink Statement and Ideal Combo Statement are non-actionable "puffery" and accordingly fail to support claims under the UCL, FAL, and CLRA.[14] (MTD I Order at 21.)

---

14. Plaintiffs argue that even if the statements are non-actionable puffery on their own, the statements must be considered as part of the Monster Drink packaging as a whole. (Opp'n. at 20.) Plaintiffs fail to allege what specific statements or elements of the Original Monster and Rehab Varieties labels and packaging, when considered together as a whole, constitute an actionable misrepresentation. *See Williams*, 552 F.3d at 939 n. 3 (Statement that snacks are "nutritious" could, standing on its own, constitute puffery, but statement not dismissed as puffery because it "contributes to the deceptive packaging as a whole."); *Henderson v. J.M. Smucker Co.*, 2011 WL 1050637, *1, 4 (C.D.Cal. Mar. 17, 2011)

■ Non-actionable puffery includes statements that are "either vague or highly subjective" as opposed to "specific, detailed factual assertions." *Newcal Indus., Inc. v. Ikon Office Solution,* 513 F.3d 1038, 1053 (9th Cir.2008) ("a statement that is quantifiable, that makes a claim as to the "specific or absolute characteristics of a product," may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery.")

■ Plaintiffs argued in their Opposition and at the hearing that the Hydrates Like a Sports Drink and the Re-hydrate Statements (together, "Hydration Statements") are false and misleading statements. Plaintiffs argue these statements are not puffery because they are quantifiable and describe absolute and specific qualities. *See Newcal,* 513 F.3d at 1053. Plaintiffs argue that these are specific statements, "designed to induce consumers" to rely on the statement and "choose Monster Drinks over other sports drinks." [15] (Opp'n. at 20.) Therefore, Plaintiffs argue the Hydration Statements are not puffery, because puffery is a statement that is "extremely unlikely to induce consumer reliance." *Newcal,* 513 F.3d at 1053.

Defendants argue that the statements are too vague and indeterminate. (Reply at 11 n. 18.) Defendants argue the term "like" is "so vague and indeterminate that is will be understood as a mere expression of opinion." (Reply at 11 n. 8); *see Baltazar v. Apple, Inc.,* 2011 WL 3795013, at *4–6 (N.D.Cal. Aug. 26, 2011) (claim that iPad is "just like a book" is mere puffery). Finally, Defendants argue that "sports drink" is an undefined term that is "used by industry and has not been defined by the agency [the FDA]." (Reply at 11 n. 18.) To claim something is "like a sports drink" is too vague and indeterminate to be a misrepresentation.

The Court finds that both the "Hydrates Like a Sports Drink" and "Rehydrate" statements are non-actionable puffery.[16] The concept of "re-hydration" or "hydration" is difficult to measure concretely, and has no discernable meaning in the context of energy drinks or beverages *See Viggiano v. Hansen Natural Corp.,* 944 F.Supp.2d 877, 881, 894 (C.D.Cal.2013) ("premium soda" mere puffery because it has no concrete, discernable meaning). Both Hydration Statements are "vague", "subjective", and unlikely to induce consumer reliance. Accordingly all of Plaintiffs "on-label" claims under the UCL,

("even if certain statements would be non-actionable on their own, where there are multiple statements at issue, we must consider the packaging as a whole."). The Court is not convinced, based on the on-label misrepresentations alleged, that the statements considered together as a whole amount to an actionable misrepresentation.

15. Plaintiffs have not alleged any facts supporting the claim that Plaintiffs chose Rehab Varieties over other sports drinks.

16. Plaintiffs argue for the first time in their Opposition that the statements related to hydration (Hydrates Like a Sports Drink and Re-hydrate) are nutrient content and structure/function claims. This argument should have been made in the SAC. In addition, this

argument fails on the merits. A nutrient claim requires Monster to make a claim about a level of nutrient in the product. For example, "Healthy" has been found by FDA regulations to constitute an "implied nutrient content claim" because it characterizes the level of nutrients in a product. *See Chacanaca v. Quaker Oats Co.,* 752 F.Supp.2d 1111, 1117 (N.D.Cal.2010). "Hydrates like a Sports Drink" or "Re-hydrate" cannot, at this time, be similarly linked to a characterization of nutrients in a product. In addition, the hydration statements are not structure or function claims because they do not claim that a specific nutrient in the drink hydrates or re-hydrates.

FAL, CLRA are dismissed as non-actionable puffery.

Plaintiffs have also failed to allege actual reliance on the alleged Re-hydration Statement, as well as all of the "off-Label" claims regarding Monster's marketing and advertising strategy.[17] Accordingly, Plaintiffs' claims under the UCL, FAL, and CLRA are DISMISSED for failure to state a claim.

### 2. Breach of Express and Implied Warranty

Defendants argue that none of the "on-label" misrepresentations constitute "warranties" and Plaintiffs fail to state a claim for breach of express or implied warranty.

 Under California law, an express warranty is created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain...." Cal. Comm.Code § 2313(1)(a). "Statements that are puffery are not actionable under a theory of breach of express warranty." *In re Clorox Consumer Litig.*, 894 F.Supp.2d 1224, 1235 (N.D.Cal. 2012). The Court has found that all three specific misrepresentations the Plaintiffs identify are non-actionable puffery, and accordingly Plaintiffs' breach of warranty claims are DISMISSED for failure to state a claim.

Generally, an implied warranty of merchantability ("IWM") accompanies every retail sale of consumer goods in the state. Cal. Civ.Code § 1792. An IWM guarantees that "consumer goods meet each of the following: (1) Pass without objection in the trade under the contract description; (2) Are fit for the ordinary purposes for which such goods are used; (3) Are adequately contained, packaged, and labeled; (4) Conform to the promises or affirmations of fact made on the container or label." Cal. Civ.Code § 1791.1(a).

Plaintiffs argue Monster Original and the Rehab Varieties do not conform to the "container's promises or affirmations." (Opp'n. at 23.) This argument is based on the same three misrepresentations discussed above in relation to the express warranty claim. As stated above, these statements are non-actionable puffery and Plaintiffs' breach of implied warranty claims are DISMISSED for failure to state a claim.

### D. Preemption

Monster argues Plaintiffs' claims should be dismissed because Plaintiffs' claims are expressly preempted, impliedly preempted, and subject to the FDA's primary jurisdiction. (Mot. at 13–19.) Specifically, Monster argues that the Food, Drug, and Cosmetic Act ("FDCA") and the Nutrition Labeling and Education Act ("NLEA"), and their implementing regulations, detail the federal provisions prohibiting "misbranding" of food and grant the FDA exclusive authority to ensure that foods are properly labeled. (*See* Mot. at 12.) Plaintiffs argue that their claims are not preempted because the "off-label" claims are in a field, marketing and advertising[18],

---

17. To the extent Plaintiff Fisher was exposed to Monster's marketing campaign when he received a free Monster Drink at his high school, the Court has dismissed this claim for failure to comply with Rule 9(b) and failure to state a claim.

18. The Court does not address preemption of the "off-label" claims by the Federal Trade Commission as they are already dismissed based on the Plaintiffs failure to allege Article III standing and comply with Rule 9(b) in regard to these "off-label" claims. The Court notes that to the extent the "off-label" claims are failure to warn or inadequate warning claims they are expressly preempted and subject to the FDA's primary jurisdiction.

that is not subject to federal preemption, and their on-label claims[19] are merely enforcing state labeling requirements that are identical to federal counterparts. (Opp'n. at 3.)

 The Supremacy Clause of the United States Constitution empowers Congress to enact legislation that preempts state law. *See Gibbons v. Ogden,* 22 U.S. 9 Wheat. 1, 82, 6 L.Ed. 23 (1824); *Law v. General Motors Corp.,* 114 F.3d 908, 909 (9th Cir.1997). "Federal preemption occurs when: (1) Congress enacts a statute that explicitly preempts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field." *Chae v. SLM Corp.,* 593 F.3d 936, 941 (9th Cir.2010).

 There is a presumption against preemption of state laws. *See Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) ("we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress' "); *In re Farm Raised Salmon Cases,* 42 Cal.4th 1077, 1088, 72 Cal. Rptr.3d 112, 175 P.3d 1170 (2008) (noting that consumer protection laws such as the UCL, FAL, and CLRA are within the states' historic police powers and therefore subject to the presumption against preemption).

The FDCA empowers the FDA (a) to protect public health by ensuring that "foods are safe, wholesome, sanitary, and properly labeled," 21 U.S.C. § 393(b)(2)(A); (b) to promulgate regulations implementing the statute; and (c) to enforce its regulations through administrative procedures. *See* 21 C.F.R. § 7.1, *et seq.* The FDCA deems a food "misbranded" if its labeling is "false or misleading in any particular." 21 U.S.C. § 343(a).

Congress amended the FDCA by enacting the NLEA "to 'clarify and to strengthen the Food and Drug Administration's legal authority to require nutrition labeling on foods, and to establish the circumstances under which claims may be made about the nutrients in foods.' " *Nutritional Health Alliance v. Shalala,* 144 F.3d 220, 223 (2d Cir.1998) (citing H.R. Rep. No. 101538, at 7 (1990)).

### 1. Express Preemption

Monster argues Plaintiffs' claims are expressly preempted because they seek to impose labeling and warning requirements "not identical" to what the FDA has mandated. (Mot. at 12.) The NLEA added an express preemption provision to the FDCA, prohibiting a state from "directly or indirectly establish[ing]" requirements for food or any labeling requirements for food that are not identical to certain requirements set forth in 21 U.S.C. § 343. *See* 21 U.S.C. § 343–1(a). 21 U.S.C. § 343 sets forth when a food is deemed misbranded.

 The NLEA preemption provision does not preempt state laws on the same subject; rather, "it allow[s] States to adopt requirements identical to the federal stan-

---

19. The Court does not address preemption or the FDA's primary jurisdiction of the UCL, FAL, and CLRA "on-label" claims related to the Hydrates Like a Sports Drink Statement and Re-hydrate Statement because those claims are subject to dismissal on other grounds. Claims related to the Hydrates Like a Sports Drink Statement are dismissed for failure to met the Rule 9(b) particularity requirements and failure to state a claim. Claims related to the Re-hydrate Statement are dismissed for lack of standing, failure to met the Rule 9(b) particularity requirements, and failure to state a claim.

dards, which could then be enforced under state law." *Kosta,* 2013 WL 2147413, at *6. Therefore, preemption only occurs when a state law claim requires a party to go beyond the FDA regulations by, for example, "includ[ing] additional or different information on a federally approved label...." *Kanter v. Warner–Lambert Co.,* 99 Cal.App.4th 780, 795, 122 Cal. Rptr.2d 72 (2002); *Chacanaca v. Quaker Oats Co.,* 752 F.Supp.2d 1111, 1121–23 (N.D.Cal.2010) (UCL and other state law claims that sought to impose labeling requirements not identical to FDA regulations were expressly preempted); *see also Kosta,* 2013 WL 2147413, at *7. A state law claim imposes a "not identical" requirement if:

> the State requirement directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food, or concerning a food container, that (i) Are not imposed by or contained in the applicable provision [or regulation] or (ii) Differ from those specifically imposed by or contained in the applicable provision [or regulation].

21 C.F.R. § 100.1(c)(4).

▮▮▮▮ As the Court previously found, Plaintiffs' consumer protection claims based on inadequate labeling regarding the amount of caffeine or the failure to warn are preempted because they seek requirements beyond what is imposed by the FDA. (*See* MTD I Order at 15–17.) Although Plaintiffs claim to have removed all claims regarding caffeine content (Opp'n. at 5), Defendants rightly point out that there remain many allegations "attacking Monster's warning labels or lack there of." (Reply at 7; Mot. at 13–15 (citing SAC ¶¶ 7, 8, 23, 45.) For example, Plaintiffs allege the Ideal Combo statement is false and misleading because of the omission of material facts regarding potential health risks. (SAC ¶ 41.) Ac-

cordingly, the Ideal Combo Statement claim, although also subject to dismissal on other grounds, is preempted and DISMISSED because it is in essence a failure to warn claim.

In addition, although unclear what Plaintiffs' allegations are in relation to the Consume Responsibly Statement, to the extent Plaintiffs claim the statement is a specific misrepresentation and fails to warn of the dangers of caffeine, or inadequately labels the drinks in regard to caffeine content, these claims are preempted and DISMISSED.

### 2. Implied Preemption

Monster argues Plaintiffs' claims are impliedly preempted because they indirectly seek to enforce FDA regulations through state consumer protection statutes. (Mot. at 14–15.) Defendants argue this is preempted because there is no private right of action to enforce the FDCA. (*Id.*) (relying on *POM Wonderful LLC v. Coca–Cola Co.,* 679 F.3d 1170, 1175 (9th Cir. 2012)). As noted in the MTD I Order, the Court is not persuaded by Defendants' argument that *POM Wonderful* prohibits lawsuits that indirectly bring claims to enforce alleged FDA violations. (MTD I Order at 14.) The *POM Wonderful* Court limited the ruling to the federal Lanham Act, and declined to address whether plaintiff's state law claims were preempted. *POM Wonderful,* 679 F.3d at 1179; *see also Brazil v. Dole Food Co., Inc.,* 935 F.Supp.2d 947, 956 (N.D.Cal.2013); *Kosta v. Del Monte,* 2013 WL 2147413 (N.D.Cal. May 15, 2013). Defendants have not demonstrated that Plaintiffs' claims are impliedly preempted.

### 3. Primary Jurisdiction Doctrine

▮▮▮▮ "The primary jurisdiction doctrine allows courts to stay proceedings or to dismiss a complaint without prejudice

pending the resolution of an issue within the special competence of an administrative agency ... and is to be used only if a claim involves an issue of first impression or a particularly complicated issue. Congress has committed to a regulatory agency." *Clark v. Time Warner Cable,* 523 F.3d 1110, 1114 (9th Cir.2008). A court traditionally weighs four factors in deciding whether to apply the primary jurisdiction doctrine: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Syntek Semiconductor Co. v. Microchip Tech., Inc.,* 307 F.3d 775, 781 (9th Cir.2002).

■■■ "[T]he doctrine is a 'prudential' one, under which a court determines that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." *Clark,* 523 F.3d at 1114. "Normally, if the court concludes that the dispute which forms the basis of the action is within the agency's primary jurisdiction, the case should be dismissed without prejudice so that the parties may pursue their administrative remedies." *Syntek,* 307 F.3d at 782; *Astiana v. Hain Celestial Group., Inc.,* 905 F.Supp.2d 1013, 1015–16 (N.D.Cal.2012) (dismissing claims where the absence of FDA rules or policy statements would require court to make an independent determination that would "risk undercutting the FDA's expert judgments and authority").

■■ Monster argues the primary jurisdiction doctrine applies because Congress has vested the FDA with jurisdiction over issues involving food safety and labeling,

the FDA has specialized expertise in the "technical and policy" questions involved here; the FDA's expertise is necessary because this is an issue of first impression; and the FDA has commenced a science-based evaluation of the safety of caffeine-containing food products, including energy drinks. (Mot. at 16–17.) The Court finds that Monster has sufficiently alleged that the FDA has primary jurisdiction because the agency has special competence over the matters involving the "off-label claims", inadequate warnings, and failure to warn issues in this case.

First, the matters at issue here have been placed by Congress within the jurisdiction of the FDA pursuant to statute and regulations that require the FDA's expertise. The FDA has regulatory authority over food labeling. *See* 21 U.S.C. § 341, *et seq.* The FDCA establishes a uniform federal scheme of food regulation to ensure that food is labeled in a manner that does not mislead consumers. *See id.* Food labeling enforcement is a matter that Congress has indicated requires the FDA's expertise and uniformity in administration.

Second, Plaintiffs' claims ultimately involve "technical and policy claims" about the effects of caffeine and whether Monster should be allowed to advertise and label their products in a way that appeals to a younger demographic. *See Monster Beverage Corp. v. Herrera,* 2013 WL 4573959, *1, 15 (C.D.Cal. Aug. 22, 2013). To the extent that Plaintiffs have removed claims about the caffeine content, Plaintiffs remaining claims are still grounded in allegations about misrepresentations about the effects of high levels of caffeine in energy drinks and how these effects should be explained to the public, and to youth in particular. Plaintiffs allege the claims are about the conduct of a single company (Opp'n. at 10), but throughout the SAC Plaintiffs cite to studies examining the ef-

fects of "energy drinks," demonstrating that issues raised in the SAC affect an entire industry.[20]

Third, the FDA has taken an interest in investigating and resolving whether energy drinks, including Monster, contain unsafe levels of caffeine. (*See* Exs. 1–6 to Mot.) Unlike cases cited by Plaintiffs where the FDA has declined, despite repeated requests, to act, the FDA's interest in regulating the safety of caffeine weighs in favor of exercising the primary jurisdiction doctrine. *See Jones,* 912 F.Supp.2d at 898.

The Court finds Plaintiffs' claims based on the Ideal Combo Statement, the Consume Responsibly Statement, and other allegations related to the failure to warn or adequately label Monster Drinks in relation to caffeine content, are preempted by the FDA under the Primary Jurisdiction Doctrine. In finding these claims preempted under the Primary Jurisdiction Doctrine, the Court notes that these claims may be actionable in the future if the FDA ceases their investigation and pending regulation of the safety of caffeine in food products and energy drinks. *See Janney v. Mills,* 944 F.Supp.2d 806, 809, 814 (N.D.Cal.2013) (holding that since the FDA repeatedly declined to promulgate regulations governing the use of "natural" as it applies to food products, the FDA has signaled a relative lack of interest and referral to the FDA would likely prove futile). Accordingly, these claims are DISMISSED WITHOUT PREJUDICE.

## E. MMWA Claim

Plaintiffs allege that Monster violated the MMWA. Plaintiffs allege Monster's "written affirmations of fact, promises and/or descriptions [ ] are each a 'written warranty' and/or there exists an implied warranty for the sale of [the Monster Drinks] within the meaning of the MMWA, *i.e.,* that they are safe for consumption." (SAC ¶ 144.)

To succeed on a claim under the MMWA, a plaintiff must plead successfully a breach of state warranty law. *See Birdsong v. Apple, Inc.,* 590 F.3d 955, 958 n. 2 (2009). Since Plaintiffs have failed to state a claim for breach of an express or implied warranty, their MMWA claim is properly DISMISSED. *Id.*

## F. Unjust Enrichment

Monster argues that Plaintiffs' Unjust Enrichment Claim should be dismissed because it is not an independent cause of action. (Mot. at 25.) Plaintiffs argue they are entitled to plead the claim in the alternative, based on a quasi-contract theory. (Opp'n. at 24.)

"[A] claim for unjust enrichment cannot stand alone without a cognizable claim under a quasi-contractual theory or some other form of misconduct." *Berenblat v. Apple, Inc.,* 2009 WL 2591366, at *6 (N.D.Cal. Aug. 21, 2009). Plaintiffs have not alleged any quasi-contractual theory. Plaintiffs' other claims have been dismissed, as well. Accordingly, since it cannot stand alone, the Court DISMISSES the Unjust Enrichment Claim.

## F. Fed. R. Civ. P. 8

Monster argues that Plaintiffs' SAC should be dismissed because it fails to satisfy FRCP 8. (Mot. at 4–5.) FRCP 8

---

20. *See* SAC ¶ 12 ("Energy Drinks: What Teenagers (and Their Doctors) Should Know"); *id.* ¶ 36 (2009 Mayo Clinic study on energy drinks); *id.* ¶ 38 (National Council on Sports & Fitness "Youth and Energy Drinks"); *id.* ¶¶ 62–66 (Drug Abuse Warning Network (DAWN) reports related to energy drinks); Ex. C to SAC (Letter to FDA Commissioner Hamburg Re: The Use of Caffeine in Energy Drinks.)

requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(1). "[A] district court has the discretion to dismiss a prolix complaint that fails to comply with the requirements of Rule 8, notwithstanding the existence of a viable cause of action." *Bravo v. L.A. County,* 2008 WL 4614298,*1, 2 (C.D.Cal. Oct. 10, 2008).

In the Order dismissing the FAC, the Court noted that many of the allegations in the FAC are unnecessary and irrelevant, and provided a list of examples. (MTD I Order at 24 n. 8.) Surprisingly, many of the facts specifically noted by the Court as irrelevant and unnecessary were present in the SAC.[21] The Court again reiterates that almost all of the information in the SAC related to the advertising and marketing strategy of Monster is irrelevant, as none of the Plaintiffs have alleged any exposure to Monster's marketing, aside from reading can labels. Although Plaintiffs' claims are dismissed on other grounds, the Court notes Plaintiffs' failure to comply with Rule 8.

## IV. CONCLUSION

For the reasons set forth above, the Court:

(1) DISMISSES Plaintiffs' UCL, FAL, and CLRA claims related to the Hydrates Like a Sports Drink Statement for failure to comply with Rule 9(b) and failure to state a claim for relief;

(2) DISMISSES Plaintiffs' UCL, FAL, and CLRA claims related to the Re-hydrate Statement for lack of standing, failure to comply with Rule 9(b), and failure to state a claim for relief;

(3) DISMISSES Plaintiffs' UCL, FAL, and CLRA claims related to the Ideal Combo Statement for failure to comply with Rule 8, failure to state a claim for relief and preemption;

(4) DISMISSES Plaintiffs' "off-label" UCL, FAL, and CLRA claims related to Monster's marketing and advertising campaign for lack of standing, failure to comply with Rule 9(b), failure to state a claim, and preemption to the extent they are based on claims Monster failed to warn or adequately label the Monster Drinks;

(5) DISMISSES Plaintiffs' claims for breach of express and implied warranty for failure to state a claim;

(6) DISMISSES Plaintiffs' MMWA claim for failure to state a claim;

(7) DISMISSES Plaintiffs' unjust enrichment claim for failure to state a claim.

Accordingly, the Court GRANTS Monster's Motion and dismisses Plaintiffs' SAC without prejudice.

---

21. *See e.g.* MTD I Order at 24 n.8 and compare to: SAC ¶ 11 ("Joe Camel always seems to be on the move ... or just hanging out with other hip young camels."; *id.* ¶ 55 (Monster gear promotion is remarkably similar to the now-banned Joe Camel promotional advertising ..."); *id.* ¶ 53 (transcript of a video with Ash Hodges); *id.* ¶ 54 (("It is commonly known that MILF is an acronym for 'Mother/Mom I'd Like to F*#k.' See en.wikipedia.org/wiki/MILF.").